Frank Lee GARRETT, Plaintiff,

v.

Ronald J. ANGELONE,
et al., Defendants.

Civil Action No. 95–1019–R.

United States District Court,
W.D. Virginia,
Roanoke Division.

Aug. 19, 1996.

As Amended Oct. 2, 1996.

Frank Lee Garrett, Dillwyn, VA, pro se.

Jill Theresa Bowers, Office of the Attorney General, Richmond, VA, for defendants.

### MEMORANDUM OPINION

TURK, District Judge.

Frank Lee Garrett, a handicapped Virginia inmate proceeding *pro se,* brings this action under the Civil Rights Act, 42 U.S.C. § 1983, with jurisdiction vested under 28 U.S.C. § 1343 and under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132, with jurisdiction vested under 28 U.S.C. § 1331. Plaintiff names as defendants Ronald J. Angelone, Director of the Virginia Department of Corrections (VDOC), and L.W. Huffman, Regional Director of the VDOC, suing them in both their official and individual capacities. The court interprets plaintiff's complaint to allege the following claims:

(1) Defendants have discriminated against plaintiff in violation of § 1983 and the ADA by not fulfilling plaintiff's request to participate in a vocational rehabilitation program that accommodates handicapped inmates; [1]

(2) Defendants transferred plaintiff to prisons that do not offer a vocational rehabilitation program for the handi-

---

**1.** Garrett also complains that denial of vocational rehabilitation programs for the handicapped violates a "compliance agreement" signed by the Virginia Department of Correctional Education in February 1991 in response to an investigation by the Department of Justice Civil Rights division.

capped in retaliation against plaintiff for his acting as a "jailhouse" lawyer and for his writing letters to government officials concerning his complaints against prison officials;

(3) Defendants retaliated against plaintiff and violated plaintiff's unspecified constitutional rights in the following ways:

(a) Defendants added six months to plaintiff's parole eligibility date and fourteen years to his mandatory parole release date.

(b) Defendants kept plaintiff in segregation for a disciplinary conviction for a longer time period than that to which he was sentenced.

(c) Plaintiff has served a maximum punishment by being held in segregation for eight months, by losing "good time," by being given a higher security level of 3 rather than 1, and by being moved from a custody status of "B" to a custody status of "C;"

(4) Defendants violated plaintiff's unspecified constitutional rights by denying him a hardship transfer to another prison to be closer to his mother, who has health problems and is unable to travel, and to his wife, who has health problems and has a long distance to travel.

Plaintiff seeks injunctive relief, so that he can participate in vocational rehabilitation, specifically classes in small engine repair, auto mechanics or computers, and monetary relief of $80,000 for Social Security benefits allegedly lost due to defendants' actions.

Plaintiff filed a motion for summary judgment and an affidavit.[2] Defendants, through counsel, filed a joint answer and joint motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6). The court notified the plaintiff of the defendants' motion as required by *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir.1975) and warned plaintiff that judg-

ment might be granted for the defendants if plaintiff did not respond to the motion by filing affidavits or other documents contradicting or otherwise explaining his claims. Plaintiff has not responded; however, the time allotted by the court for his response has long since expired. Therefore, this case is now ripe for the court's consideration. Upon review of the record, it is the opinion of the court that defendants' motion to dismiss must be granted and that plaintiff's motion for summary judgment must be denied.

## I. SUMMARY OF FACTS

Plaintiff Garrett alleges the following sequence of events. Garrett has been a disabled veteran since 1968. He has been in and out of a wheelchair from 1968 to 1989, since which time Garrett has been in a wheelchair full time.[3] Prior to his incarceration, Garrett received benefits from the Social Security Administration and Veterans Administration.[4] On September 5, 1989, the Social Security Administration informed Garrett that his benefits had to be suspended due to his imprisonment and that Garrett could receive benefits again only if he actively and satisfactorily participated in an approved rehabilitation program. Accordingly, Garrett requested that prison administrators place him in a vocational rehabilitation program (hereinafter "VRP").

At this time, Garrett was incarcerated at Buckingham Correctional Center, a penal institution within the Virginia Department of Corrections (VDOC), but none of its programs accommodated inmates in wheelchairs. Therefore, Garrett requested that he be transferred to another prison that would offer a program in which he could participate. Between 1989 and 1992, Garrett waited to be transferred.

---

**2.** The court construed plaintiff's affidavit as a motion to amend the complaint to particularize the claims and as support for plaintiff's motion for summary judgment.

**3.** Plaintiff has bullet fragments in his spine, a bad leg and/or knee, a back impairment of "L4 and L5" of the lumbosacral spine, and crippling arthritis.

**4.** Plaintiff is serving a sentence totalling sixty-eight years. He is serving fifteen years for aggravated sexual battery, fifty years for sexual assault/rape, and three years for incest with a minor.

Garrett continually refers to a 1991 "compliance agreement." A letter he submits as part of his complaint indicates that two other handicapped inmates at Powhatan Correctional Center filed a complaint to the United States Department of Justice Civil Rights Division (DJCRD) about the lack of VRPs for handicapped inmates in the Virginia Department of Corrections (VDOC). The DJCRD and the Virginia Department of Correctional Education (VDCE) signed a "compliance agreement" on February 28, 1991 in which the VDCE agreed

> that all educational programs and activities will be accessible to inmates with handicaps, that all inmates with handicaps who are housed at Northern Housing Unit [at Powhatan] will be eligible for the same or similar vocational education programs as provided to other inmates, that Marshall Ferguson and Nathan Mullins [the two inmates who brought the complaint to the DJCRD] will be provided access to educational programs, and that all education programs will be relocated to an accessible location.

On January 16, 1992, Garrett was transferred to Northern Housing Unit, which is a medical unit of the Powhatan Correctional Center that accommodates inmates confined to a wheelchair and which offers a vocational rehabilitation program for handicapped inmates. Garrett immediately tried to enter the program but was unable to get an enrollment application. Garrett filed four requests and then a grievance form on February 19, 1992. On the next day, Garrett met with his counselor, at which time Garrett completed an application. This meeting occurred just over a month after he first tried to get an application.

After another month, Garrett was told he was approved to start in the vocational rehabilitation program on April 16, 1992. Garrett went to class on that day, but his instructor told him that he had to complete some paperwork for Garrett and that Garrett could start the next day. Garrett continued to go to class, but each time he went he was told that the paperwork was not yet completed. The instructor finally told Garrett not to come back until he was informed of when he could start. On April 22, Garrett had his Institutional Treatment Plan meeting and was told he would start that week.[5] Garrett never was allowed to begin the program.

Approximately seven months later on November 19, 1992, all handicapped inmates at Powhatan were transferred to Deep Meadows Correctional Center. Deep Meadows did not have a vocational rehabilitation program when Garrett arrived, and the only access the handicapped had to the facility was a ramp into the building in which they lived. On May 17, 1993, Garrett wrote to the United States Department of Justice and to the United States Department of Education. Garrett alleged that the Virginia Department of Correctional Education (VDCE) had failed to implement assurances agreed to in the "compliance agreement" with Inmate Mullins.

In response to Garrett's May 17, 1993 letter, the United States Department of Education wrote him a letter on June 4, 1993, informing him that a complaint would be filed in his name; the letter also indicated that, according to VDCE officials, the new classroom facility at Deep Meadows would be operational by October 31, 1993.[6] Garrett and other inmates had somehow also been informed that the classroom already existed

---

**5.** Plaintiff submits an exhibit of an Institutional Treatment Plan form that a VDOC employee completed on April 22, 1992. The employee stated that plaintiff should continue to be involved in the auto mechanics vocational school classroom training and correspondence programs and that plaintiff should consider an institutional program to help others in their own development.

**6.** The Office of Civil Rights (OCR) of Department of Education explains that it is responsible for enforcing Section 504 of the Rehabilitation Act of

1973 and its implementing regulation, at 34 C.F.R. Part 104, which prohibits discrimination on the basis of disability in programs and activities receiving federal financial assistance. The Department of Education also explains that it has jurisdiction as a designated agency under Title II of the Americans with Disabilities Act of 1990 ["ADA"] that are filed against certain public educational entities. The court notes although the OCR may have this responsibility, it is unclear to what degree the ADA applies to prisons. *Torcasio.*

and that the reason they could not participate in the vocational rehabilitation program was that there was no instructor to teach them. However, that year eight inmates graduated from the auto mechanics program,[7] and the entire vocational rehabilitation program's graduating class consisted only of inmates without handicaps. On October 28, 1993, he signed up to take a small engine repair class, but does not state whether he was able to take the class or, if not, why.

While Garrett was waiting for the classroom facility at Deep Meadows to be completed, he was able to take college courses. Then, on September 1, 1994, at the start of his third semester, he was transferred to Dillwyn Correctional Center. By this time, Garrett had waited two years for the facility at Deep Meadows to open; the facility at Deep Meadows was finally ready later in September, 1994, a year past the date on which it was to be operational.

At Dillwyn Correctional Center, Garrett was first on the list for entrance into the vocational rehabilitation program. On September 1, 1994, immediately after he arrived at Dillwyn, Garrett checked with Barbara Burrell, principal of the Department of Correctional Education. Ms. Burrell informed him that Dillwyn did not have a program for the handicapped. Therefore, Garrett filed inmate grievance forms, requesting to be allowed to take a small engines repair class; the responses to the grievances indicate that Dillwyn had no small engine repair class at that time, but that if one was started, Garrett could participate.

Garrett later checked again with Ms. Burrell, who at this time told him about a welding class that he could take, suggesting that such a class would be helpful in developing the small engine repair skills of interest to Garrett. Garrett applied for the welding program but does not state whether or not he actually had the opportunity to participate in this program.

Garrett wrote a letter on February 13, 1995, to Senator John Warner and on March 3, 1995, to Senator Charles Robb. On April 20, 1995, Garrett received from L.W. Huffman a letter in response to these letters that were "passed down from" Ron Angelone's office. Prior to this letter, Huffman wrote Garrett on December 1, 1994, informing Garrett of a program for sex offenders and advising Garrett to inform James Cooper of what Huffman viewed as Garrett's need and interest in participating in such a program. Garrett also asked T.F. Neumayer, head of the vocational rehabilitation program, that a program for the handicapped be instigated.

In addition to Garrett's allegations concerning complaints (1) and (2), in regard to his handicapped condition and desire to enter a vocational rehabilitation program, Garrett alleges the following, rather rambling series of events. Garrett was to be placed in segregated confinement for only four days as punishment for prison misconduct, but had been there for over eight months at the time the complaint was filed, with "no real idea" of when he would be released or why he was still in segregation. He also alleges that he has been retaliated against by being held in segregation for eight months, by being given a higher security level of 3 rather than 1, and by being moved from a custody status of "B" to a custody status of "C." Garrett also lost "good time" as a result of the disciplinary conviction and then defendants reduced the rate at which he earned good time, from 30 days earned for every 30 days served to zero days earned for every thirty days served. Furthermore, defendants "added" six months to Garrett's first parole hearing and fourteen years to his mandatory parole release date.

Finally, three times Garrett has been denied a hardship transfer to Haynesville so that he could more easily receive visits from his wife and mother, who both have had health problems and live a lengthy distance from Dillwyn. Garrett has been unable to see his wife since October of 1994 because of her health and the driving distance. Garrett has tried to work things out at the institutional level but has not succeeded. Garrett's wife has communicated with Mr. Heller and

---

7. In support of this allegation, Garrett submits a copy of a 1992 graduation program from Powhatan which lists eight inmates as graduates from an auto mechanics class. Deep Meadow and Powhatan are both located in Farmville, Virginia.

Mr. Power about Garrett's circumstances for almost a year.

Garrett has made phone calls and written letters concerning his complaints to defendant Angelone and to various government officials, including President Clinton, United States Senators Charles Robb and John Warner, Congressman Herb Bateman, Governor Allen, and Congressman L.F. Payne. Upon receiving phone calls and letters, Governor Allen called and sent letters to Angelone, who then answered the letters and sent them on to L.W. Huffman, who passed them on to others.

In Garrett's lifetime, Garrett has been a crane oiler, truck driver, "line man," "grondma," and pastor. He most desires to participate in the auto mechanics small engine repair vocational program so that he will be prepared for a job when he is released. Garrett is currently confined at the Dillwyn Correctional Center.

## II. OPINION OF THE COURT

In an action brought pursuant to 42 U.S.C. § 1983, a motion to dismiss the complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6) should not be granted "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957); *Hishon v. King & Spalding,* 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984); *Revene v. Charles County Comm'rs,* 882 F.2d 870, 872 (4th Cir.1989). The allegations in the complaint should be construed in the light most favorable to the pleader. *Scheuer v. Rhodes,* 416 U.S. 232, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

Upon motion for summary judgment, the court must view the facts, and the inferences to be drawn from those facts, in the light most favorable to the party opposing the motion. *Ross v. Communications Satellite Corp.,* 759 F.2d 355 (4th Cir.1985).

Summary judgment is proper where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Federal Rule of Civil Procedure 56(c). However, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### A. Moot Claims for Injunctive Relief

■ The Court notes at the outset that claims for injunctive relief for events occurring at Buckingham, Powhatan and Deep Meadow Correctional Centers must be dismissed as moot, as plaintiff is no longer subjected to the conditions at these institutions of which he complains. *See Williams v. Griffin,* 952 F.2d 820 (4th Cir.1991); *Magee v. Waters,* 810 F.2d 451 (4th Cir.1987). Thus, the court shall address claims for injunctive relief only as they may be warranted at Garrett's current institution.

### B. Claims Barred by the Statute of Limitations

■ Several facets of plaintiff's claims for damages are barred by the applicable statute of limitations as they are based on events which occurred too long ago. No federal statute of limitations governs § 1983 actions. *Burnett v. Grattan,* 468 U.S. 42, 104 S.Ct. 2924, 82 L.Ed.2d 36 (1984). Accordingly, § 1983 actions are governed by the state statute of limitations applicable for personal injury cases in the state where the alleged violations occur. *Id.* Under the Virginia statute of limitations for personal injury actions, a plaintiff must bring his cause of action within two years from the time that the action accrues. Va.Code Ann. § 8.01–243(A) (Michie 1992). In a federal case, the time of accrual of an action is a federal question. *Cox v. Stanton,* 529 F.2d 47 (4th Cir.1975). Under federal law, a cause of action accrues when the plaintiff knows of sufficient facts about the injury that reasonable inquiry will apprise him of his cause of action. *United States v. Kubrick,* 444 U.S. 111, 122–24, 100 S.Ct. 352, 359–60, 62 L.Ed.2d 259 (1979); *Cox, supra* (action accrued when the § 1983 plaintiff knew or had reason to know of the injury). An inmate's

§ 1983 action is commenced for purposes of the statute of limitations as soon as he delivers his complaint to prison authorities for mailing. *Lewis v. Richmond City Police Dep't,* 947 F.2d 733 (4th Cir.1991). In Virginia § 1983 cases, then, if an inmate has not delivered his complaint to prison officials for mailing within the two-year period following the time when he knew or had reason to know of his alleged injury, the Virginia statute of limitations bars that inmate from bringing suit about that injury.

The court filed Garrett's complaint on September 14, 1995. Since no certificate of mailing accompanies Garrett's complaint, the time of filing is the date at which the action is deemed to have commenced for statute of limitation purposes. After review of Garrett's factual contentions, it is the opinion of the court that Garrett is barred from obtaining monetary damages or injunctive relief under § 1983 for claims of which he knew or had reason to know before September 14, 1993; any such claim falls in the time period outside of the two-year statutory limit calculated from the September 14, 1995, filing date.

One may argue that Garrett may not have had reason to be aware of claims alleging discrimination based on his handicap until a pattern developed from which Garrett could determine that discrimination was taking place. However, on June 3, 1993, Garrett filed a prior complaint against Edward Murray, Director of the Virginia Department of Corrections, and Alton Baskerville, Warden of Deep Meadows Correction Center, in which Garrett claimed that these defendants discriminated against him on the basis of his handicap when they denied him access to certain vocational education programs. Civ. Action No. 2:93CV565 (E.D.Va., June 22, 1995). Garrett's filing of the earlier action indicates that he knew or should have known the facts necessary to bring a discrimination claim about events occurring in 1991 through 1993. Thus, it is the opinion of the court that claims concerning the following time period and locations are barred under the statute of limitations: any event occurring at Buckingham Correctional Center, Powhatan Correctional Center, or Deep Meadows Correctional Center occurring before September 14, 1993. Therefore, the only § 1983 claims that Garrett can bring before the court in this action are those accruing after September 14, 1993.

## C. Collateral Estoppel of Discrimination Claims

■ Defendants assert that Garrett's discrimination claims concerning events at Deep Meadow, under both the Fourteenth Amendment and the ADA, are barred under the doctrine of collateral estoppel. Garrett filed a previous lawsuit raising an equal protection claim concerning denial of vocational rehabilitation at Deep Meadow. *See Garrett v. Murray, et als.,* Civil Action No. 2:93CV565 (E.D.Va., June 22, 1995) (summary judgment granted for defendants). In this earlier case, Garrett claimed that the defendants had discriminated against him on the basis of his handicap when they denied him access to certain vocational education programs, in violation of equal protection. The United States District Court for the Eastern District of Virginia granted defendants' motion for summary judgment, on grounds that Garrett acknowledged having had the opportunity to take courses at Deep Meadow during the time period relevant to the litigation and that financial considerations of the institution in constructing the new classroom building were sufficient to justify different treatment of Garrett and other inmates in his housing unit. The court specifically noted that the allegations could be construed to raise a claim under the ADA, but that such construction would only duplicate claims.

Collateral estoppel precludes relitigation of issues actually litigated and necessary to the outcome of a previous civil action in federal court, even against different defendants. *See Parklane Hosiery Co. v. Shore,* 439 U.S. 322, 99 S.Ct. 645, 58 L.Ed.2d 552 (1979); *Blonder–Tongue Labs., Inc. v. Univ. of Ill. Found.,* 402 U.S. 313, 91 S.Ct. 1434, 28 L.Ed.2d 788 (1971). Even though Garrett's previous federal action was against different defendants, resolution of that case necessarily required litigation of a material factual issue at stake in Garrett's present discrimination claims against Deep Meadow: whether vocational rehabilitation classes were of-

fered to other inmates housed with Garrett. Garrett states that no VRP programs were available at Deep Meadow when he first arrived there and that the new classroom building where classes were to be held for inmates in his housing unit was not finished before he was transferred to Dillwyn. As stated above, the Eastern District made a factual finding on this issue as a necessary element of Garrett's equal protection claim; that court found that defendants failed to provide Garrett with VRP classes because the building was not finished yet and, thus, not merely because of his handicap, as he claimed. Because the factual issue of discrimination on the basis of handicap at Deep Meadow was litigated and decided by the Eastern District in the previous action, Garrett is estopped from rearguing this factual issue in any later litigation. *Parklane, supra.*

To present either an equal protection claim or an ADA claim in his present action, Garrett must allege that defendants have denied him access to an available service or program based only on his handicap. *See Moss v. Clark,* 886 F.2d 686 (4th Cir.1989) and 42 U.S.C. § 12131.[8] Although both claims consist of several other elements in addition, if plaintiff fails to establish this discrimination element, he fails to establish either claim. Accordingly, the court finds that Garrett is barred under the doctrine of collateral estoppel from bringing any claims in this action concerning discrimination in education programs on the basis of handicap at Deep Meadow.

## D. Remaining Discrimination Claims

Based on the foregoing findings, Garrett's only discrimination claims remaining concern events at Dillwyn in 1994 and 1995. In bringing his discrimination claims, Garrett argues initially that the defendants violated his federal rights because they did not make sure that VDCE officials fully complied with the 1991 "compliance agreement," which called for the VDCE to provide handicapped inmates with more access to VRPs through-

out the VDOC. The court finds no legal basis upon which Garrett or anyone else could enforce this compliance agreement by filing an ADA or § 1983 claim in federal court. As stated above, from Garrett's pleadings, the court construes his discrimination claims to arise, if at all, under the Equal Protection Clause of the Fourteenth Amendment and the ADA.

Defendants maintain that the ADA does not apply to state prisons and that they are entitled to dismissal because they enjoy qualified immunity as to Garrett's ADA claim. Public officers are entitled to qualified immunity from claims for monetary damages if they can prove that their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware. *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982); *see also Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 3038, 97 L.Ed.2d 523 (1987).

Title II of the ADA prohibits discrimination against the disabled by "public entities." Inmates have argued that state prisons are "public entities" for purposes of the act as the ADA itself does not explicitly exclude state prisons from Title II coverage. However, neither this court, the United States Court of Appeals for the Fourth Circuit or the United States Supreme Court have yet ruled on the matter. *See Torcasio v. Murray,* 57 F.3d 1340 (4th Cir.1995). In *Torcasio,* the Fourth Circuit held that any rights which inmates may have under the ADA were not clearly established at the time of the *Torcasio* suit, since Congress has not specifically stated that the ADA applies to prisons and since courts are in disagreement over the ADA's application to prisons. 57 F.3d at 1350. Accordingly, the Fourth Circuit held that prison officials were entitled to qualified immunity against Torcasio's claims for monetary damages. *Id.* at 1353.

---

**8.** To state a claim under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., Garrett must be a "qualified individual with a disability," such that he, with or without reasonable modifications to rules and physical struc-

tures, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity. 42 U.S.C. § 12131.

The applicability of the ADA to state prisons is no more clearly established now than it was at the time the Fourth Circuit decided *Torcasio.* Therefore, the court finds that defendants' actions did not violate any clearly established right under the ADA and that they are entitled to qualified immunity as a matter of law against Garrett's claim for monetary damages under the ADA. *See Harlow* and *Torcasio, supra.* However, qualified immunity protects officials only from monetary liability, and, as stated, no controlling precedent from any court has held that the ADA does not apply to prisons at all. Inasmuch as the court finds below that Garrett's allegations fail to state any claim under the ADA, even assuming without deciding that it is applicable to inmates, the court need not address the scope of the ADA's application.

■■■ To the extent which Garrett seeks to raise a discrimination claim based on the VDOC-wide lack of VRP for handicapped inmates, his rights are severely limited by the inherent restrictions of inmate status. Inmates relinquish many rights upon conviction. First, inmates also have no constitutional right to be housed in any particular prison or housing unit. *Meachum v. Fano,* 427 U.S. 215, 96 S.Ct. 2532, 49 L.Ed.2d 451 (1976). In decisions concerning housing of specific prisoners, the courts must defer to the expertise and discretion of prison officials who are much better equipped to analyze prison security needs; judicial inquiry must remain limited to whether a particular prison system or regulation violates constitutional or federal law. *See Block v. Rutherford,* 468 U.S. 576, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984). Second, inmates have no constitutional right to rehabilitation or educational programs. *See Rhodes v. Chapman,* 452 U.S. 337, 348, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981) (deprivation of rehabilitation and educational programs does not violate Eighth Amendment); *Bowring v. Godwin,* 551 F.2d 44 (4th Cir.1977) (setting standard under which inmates must be provided psychiatric treatment).

■■■ Neither the Equal Protection Clause nor the ADA create a right for an inmate to demand that the prison system or specific prison implement a specific type of rehabilitation or educational program which is not already available. *See, e.g., Niece v. Fitzner,* 922 F.Supp. 1208 (E.D.Mich.1996) (ADA does not require government entity to provide any particular service not already provided). Neither do these provisions create any right for an inmate to be housed at a specific prison. *See, e.g., Moss v. Clark, supra* (to demonstrate equal protection claim, inmate must show that he was treated differently than others similarly situated). Accordingly, to state a claim under either provision, an inmate must allege that the desired program was available to others at his housing unit and that access was denied to him based on his handicap.

It is the opinion of the court that Garrett fails to allege this necessary element of his claims concerning events at Dillwyn. He states that no programs were provided specifically for handicapped inmates at Dillwyn. However, this fact, in and of itself, does not state any claim under equal protection or the ADA, as neither provision requires a prison to create new programs at the demand of a handicapped inmate. In his pleadings Garrett includes grievance responses from the program coordinator in which she informed him that Dillwyn does not provide classes in computers, bookkeeping or small engine repair to any inmate. She listed the courses which were available (welding, electronics and sheet metal) and told him that he could sign up for any of them. To Garrett's subsequent request to sign up for welding class, she responded that she had put his name on the waiting list. Nowhere does Garrett allege or offer evidence that, *based on his handicap,* he was denied access to that welding class (or any of the other classes available at Dillwyn). Even assuming that he had to wait to join the class until there was an opening, he has not alleged that the delay had anything to do with his being wheelchair bound or that other, nonhandicapped inmates recently transferred to the facility would not have had the same delay. Based on the foregoing allegations, the court finds that Garrett has failed to allege an element material to his equal protection and ADA claims

and that these claims must be dismissed accordingly, pursuant to Rule 12(b).

### E. Collateral Estoppel of Segregation Claims

The doctrine of collateral estoppel also bars Garrett from relitigating his claim that he has been held in solitary confinement without due process. In *Garrett v. Farmer*, Civ. Action No. 95–0200–R (W.D.Va., April 21, 1995), Garrett claimed that he had been held in solitary confinement without due process. Just as he does in his current complaint, Garrett alleged that in February 1995, he was sentenced to four days in solitary confinement for allegedly attacking another inmate with the leg of his wheelchair the month before, but that he had been kept in solitary for a longer period of time. In his current complaint, Garrett alleges that he was sentenced to four days in segregation as punishment for misconduct, but that he remained in segregation for much longer than that. Although he does not give the specific dates in his current complaint, the court is satisfied that these allegations concern the same series of events.

In *Garrett v. Farmer*, the court held that Garrett had received the full panoply of federally mandated procedural protections to which he was entitled before being punished with solitary confinement. In addition, the court noted that after the disciplinary hearing, Garrett remained in segregated housing because the Internal Classification Committee (ICC) determined administratively that it was the best place for him to be until he could be transferred for safety reasons. To the extent that Garrett attempts in his current action to claim that his lengthy stay in segregated confinement constituted a violation of due process, he is estopped, as that issue has already been litigated as a necessary part of the outcome in *Garrett v. Farmer*. *Parklane, supra*.

### F. Due Process Claims

Garrett also alleges that defendants have violated his rights because, as a result of his disciplinary offense, he was held in segregation, he had his security level and custody status decreased, and he lost the opportunity to earn good conduct time, as his good conduct time earning rate was reduced. The court takes judicial notice of the fact that all of these classifications are subject to change at any time during an inmate's incarceration, based on the behavior of the inmate and the discretion of prison officials. A prison regulation creates a liberty interest and implicates federal due process protections only where the regulation imposes upon the inmate conditions which dramatically depart from the expected conditions of his indeterminate sentence. *See Sandin v. Conner*, —— U.S. ——, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Since custody and security status and good time earning rates are subject to change, a specific change to these classifications does not implicate federal due process protections. *Id.*

Garrett also complains that the defendants' actions added six months to his "first parole hearing" (his parole eligibility date) and fourteen years to his mandatory parole release date. The court takes judicial notice of the fact that the parole eligibility date (the year in which an inmate becomes eligible for consideration for discretionary parole release) and his mandatory parole release date are estimates only, subject to change based on changes in the inmate's other classifications. Since the court has already determined that the classification changes did not deprive Garrett of due process, the court also finds no due process problem with the changes to the estimates of his parole eligibility date and mandatory release date. In any event, an inmate has no constitutional right to be paroled at all before the expiration of his valid criminal sentence, let alone on a specific date. *Greenholtz v. Nebraska Penal Inmates*, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103–04, 60 L.Ed.2d 668 (1979).

### G. Hardship Transfer and Interference with Visitation

While Garrett's desire for transfer nearer to his ailing wife and mother is certainly understandable, the court finds that denial of such a transfer does not implicate any constitutionally protected right. As stated above, an inmate has no constitutional right to be housed in any particular prison.

*Meachum, supra.* Virginia's prison transfer regulations do not create any liberty interest in a specific housing assignment, as prison officials have broad discretion under the regulations to determine the facility at which an inmate is housed. *Sandin, supra; Olim v. Wakinekona,* 461 U.S. 238, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983) (no liberty interest created under law prior to *Sandin* ). In addition, neither inmates nor their potential visitors have any constitutional right to visitation. *See White v. Keller,* 438 F.Supp. 110 (D.Md. 1977), aff'd, 588 F.2d 913 (4th Cir.1978); *Kentucky Dep't of Corrections v. Thompson,* 490 U.S. 454, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). Accordingly, defendants' alleged refusal to transfer Garrett to Haynesville does not implicate any constitutionally protected right, even if the refusal directly interferes with Garrett's right to receive visits from his wife and mother.

## H. Retaliation Claims

Garrett alleges that the majority of defendants' allegedly unconstitutional actions against him have been motivated by their desire to retaliate against him for his activism in procuring VRP classes and building access for handicapped inmates within the VDOC and his activities as a "jailhouse lawyer." Retaliation against an inmate for the exercise of a constitutionally protected right states a § 1983 claim. *American Civ. Liberties Union v. Wicomico County,* 999 F.2d 780 (4th Cir.1993); *Hudspeth v. Figgins,* 584 F.2d 1345 (4th Cir.1978), *cert. denied,* 441 U.S. 913, 99 S.Ct. 2013, 60 L.Ed.2d 386 (1979); *Russell v. Oliver,* 552 F.2d 115 (4th Cir.1977). However, the inmate must allege sufficient facts which tend to support his allegation of a retaliation motive behind defendants' actions. *White v. White,* 886 F.2d 721 (4th Cir.1989). Bare assertions of retaliation do not establish a claim of constitutional dimensions. *Adams v. Rice,* 40 F.3d 72 (4th Cir.1994).

Based on these principles, the court finds that plaintiff's allegations fail to state any retaliation claim cognizable under § 1983. Garrett does not allege any facts supporting his retaliation assertions other than the fact that certain events followed certain other events. However, he admits that defendants have told him he cannot be transferred to Haynesville because that institution could not meet his medical needs. He was kept in segregation because defendants found that he had an enemy problem and needed a transfer. He was transferred to Deep Meadow because the buildings were accessible to wheelchairs. He simply has not pointed to any fact which supports his claims of retaliatory motive behind the actions of which he complains. *Adams, supra.* Therefore, the court finds that these claims must also be dismissed.

## I. Conclusion

In conclusion, as the court is of the opinion that none of plaintiff's allegations state claims upon which relief can be granted under § 1983, defendants' motion to dismiss must be granted. Inasmuch as plaintiff has not alleged facts stating any claim cognizable under § 1983, he has failed to demonstrate that any genuine issue of material fact remains in dispute for trial or that he is entitled to summary judgment as a matter of law; his motion must be denied. *Anderson, supra.* An appropriate order shall be entered this day.